**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

MICHIGAN RESTAURANT &
LODGING ASSOCIATION; HEIRLOOM
HOSPITALITY GROUP, LLC; H.I.H.
INC. d/b/a SUBURBAN INNS,

           Plaintiffs,

vs.

ROBERT GORDON, in his official
capacity as Director of the Michigan
Department of Health and Human Services,

           Defendant.

_____

Case No.  1:20-cv-01104-JTN-RSK

Hon. Janet T. Neff

**FIRST AMENDED VERIFIED**
**COMPLAINT FOR DECLARATORY**
**AND INJUNCTIVE RELIEF**

The Michigan Restaurant & Lodging Association ("MRLA"), Heirloom Hospitality Group LLC ("Heirloom"), and H.I.H. Inc. d/b/a Suburban Inns ("Suburban Inns") (collectively, "Plaintiffs"), bring this lawsuit to vindicate their rights under the United States and Michigan Constitutions to permit indoor food and beverage consumption notwithstanding the Emergency Order issued on November 15, 2020 by the Michigan Department of Health and Human Services ("MDHHS").  Plaintiffs brings this Complaint for declaratory and emergency injunctive relief against Defendant Robert Gordon, in his official capacity as Director of the MDHHS, and allege as follows:

## INTRODUCTION

1.      Since the beginning of the global pandemic, Michigan Governor Gretchen Whitmer has issued nearly 200 executive orders that – in the name of protecting public health – required material restrictions and cessation of private business for numerous establishments, including restaurants and bars, deemed "nonessential."  The Michigan Supreme Court has since held the

1

majority of the Governor's orders unconstitutional under the Michigan Constitution. *In re Certified Questions From U.S. Dist. Court, W. Dist. Of Mich., S. Div.,* No. 161492, 2020 WL 5877599, at \*15 (Mich. Oct. 2, 2020). In its decision, the Court unanimously held that Governor Whitmer did not have authority to issue the majority of her "sweeping" Executive Orders. *Id.* At the same time, the Court explicitly indicated that going forward "the Governor and Legislature" should "work together to address this challenge and we hope that this will take place." *Id.* at \*3, n.1.

2.     However, the Governor has not worked with the Legislature to address the continuing challenge of COVID-19. Instead, the Governor has turned to MDHHS to circumvent the Michigan Supreme Court's decision and order in *In re Certified Questions,* and has directed MDHHS to issue multiple orders that once again impermissibly infringe on Plaintiffs' rights under the Michigan and United States Constitutions. While Plaintiffs do not disagree with the need to protect public health, Director Gordon's most recent action, the "Emergency Order under MCL 333.2253 – Gatherings and Face Mask Order" issued on November 15, 2020 ("November 15 Order," attached here as Exhibit 1), which closes establishments for indoor food and beverage consumption, does not accomplish that goal as applied to Plaintiffs.

3.     The ostensible purpose of the November 15 Order is to prevent person-to-person contact and spread of COVID-19. But the threat or likelihood of such contact and spread does not depend on whether a business activity is deemed by the government to be essential. That threat depends on the health and safety measures being taken by business owners to mitigate the threat.

4.     Plaintiffs will be materially affected by the November 15 Order. Under threat of criminal penalties, they have been forced to close or materially restrict their business activities in violation of their constitutional rights. At the same time, the Governor and MDHHS have

permitted and continue to permit numerous indoor "non-essential" business activities, provided those business owners adhere to health and safety guidance, principally from the United States Center for Disease Control and Prevention (the "CDC") and from MDHHS. Inexplicably, restaurants and bars are not given that option under the November 15 Order, even though they have continuously and unequivocally demonstrated for several months of operation during the pandemic that they can do so safely. Plaintiffs are fully willing and capable of adhering to strict health and safety guidance, including that in prior MDHHS orders, and have so notified Defendant.

5.      Plaintiffs have shown themselves highly capable of following the comprehensive protocols that have been in place for several months, and there is no reason in-person dining should be entirely prohibited now, especially while the November 15 Order permits other businesses to have clientele indoors and on premises. For example, under the November 15 Order, it is legal to get a tattoo or haircut but not to eat a meal indoors at a restaurant.

6.      Plaintiffs barely survived the devastating effects of Governor Whitmer's invalid Executive Orders and now more than ever need to be afforded the same opportunities other businesses like gyms, salons, and tattoo parlors have under the November 15 Order to continue to operate – before it is too late and Plaintiffs are forced to close many of their businesses forever.

7.      While restaurants could rely on federal dollars and utilize outdoor seating during the comparatively mild weather of the first shutdown, those federal dollars are gone and the weather in Michigan in November and December will make offering outdoor seating options physically and economically impossible.

8.      During the most recent months of the pandemic, restaurants have provided a place for people to gather safely. Restaurants offer a highly regulated, sanitized, capacity-limited and appropriately spaced setting for people to congregate that is indisputably less likely to spread

COVID-19 than the innumerable residential holiday social gatherings that will now occur in totally unregulated residential environments.

9. MDHHS's own data supports keeping restaurants open. In spite of serving millions of Michiganders each day, there are only 5 investigations statewide involving a restaurant patron and MDHHS itself attributes only about 4.4% of outbreaks to restaurants. Yet, given the reality of the November 15 Order, more than 40% of restaurants are now likely to close at least temporarily and 250,000 employees are likely to be laid off from restaurants over the holiday season – with no federal funds and an exhausted Unemployment Insurance Trust Fund.

10. Director Gordon's decision to effectively shutter restaurants for a second time this year – this time with no safety net of federal stimulus dollars to soften the blow to already ailing operators and employees – will absolutely lead to a catastrophic economic fallout. Approximately 2,000 restaurants have already closed their doors permanently in Michigan in 2020 and if the prohibition on indoor dining is prolonged, 6,000 more restaurants are likely to permanently close by spring 2021. Plainly, based on MDHHS's own transmission data, the human toll on restaurant owners, their employees, and the entire food service supply chain will be dramatically worse than what Director Gordon is attempting to mitigate through the November 15 Order. In fact, closing down the restaurant industry in Michigan will affect Michigan's broader economy and potentially imperil the ability for basic food supplies to be distributed in the state.

11. There is nominal if any public health benefit from the November 15 Order as applied to food service establishments. It is indisputable that the indoor consumption of food and beverages can be done safely and at least as safely as indoor salon services and retail shopping. In fact, despite ever-present COVID-19 concerns, indoor consumption of food and beverages at

restaurants utilizing proper health and safety guidance is still currently permitted just over the state line, in Indiana and Ohio.

12.     Accordingly, Plaintiffs seek an emergency preliminary injunction that allows them to immediately resume on-premises, indoor food and beverage consumption.  They also seek a permanent injunction protecting these interests, together with costs and actual attorney fees.

## PARTIES

13.     First established in 1921, the MRLA is a trade association representing thousands of Michigan food service, beverage, and lodging establishments.  Its principal office is located in Lansing, Michigan.  MRLA's members, members' employees, and those like them make up an integral part of Michigan's economy, employing nearly 600,000 people and generating $40 billion in statewide annual revenue.

14.     Suburban Inns is a corporation headquartered in Hudsonville, Michigan.  Peter R. and Carol Beukema founded Suburban Inns in 1979 with just one small hotel in St. Ignace, Michigan – The Georgian House.  Peter D. Beukema, the son of the company's founders, is currently the chief executive officer of Suburban Inns, which today employs approximately 250 people (down from 775 in March 2020) and develops, owns, and operates eight hotels in Michigan: the Hampton Inn of Holland, the Holiday Inn Express of Holland, the Holiday Inn Express of Grand Rapids SW/Grandville, the Holiday Inn of Midland, the Courtyard Marriott of Holland, Hilton Garden Inn Grand Rapids East, Embassy Suites Grand Rapids Downtown, and CityFlatsHotel Holland.  Suburban Inns also owns and manages four Michigan restaurants: Big E's Sports Grill in Holland, Midland, and Grand Rapids as well as Sharkee's Bar and Grill in Holland.

15. Heirloom is one of Detroit's preeminent restaurant and hospitality companies. Founded in 2011 by Jeremy Sasson, the oldest son of immigrants who came to the United States with $400 and a dream, Heirloom now develops, owns, and operates three world-class restaurant venues that push the limits of its guests' understanding of food and beverage, style and service: Townhouse Birmingham, Townhouse Detroit, and Prime and Proper. In March 2020, Heirloom had 350 employees but now operates with only its most senior team members. While Heirloom survived the first shutdown by providing contactless delivery, prepared meals, and meal kits for months, it will be economically gutted and may not survive a second shutdown.

16. Defendant Robert Gordon is the Director of the Michigan Department of Health and Human Services and is being sued in his official capacity. Defendant Gordon is, and at all relevant times was, an employee of the State of Michigan; he issued the challenged November 15 Order.

## JURISDICTION AND VENUE

17. Plaintiffs seek declaratory and injunctive relief preventing enforcement of the November 15 Order against Plaintiffs and similarly situated parties.

18. Plaintiffs bring this lawsuit pursuant to the Civil Rights Act of 1871, 42 U.S.C. § 1983, and allege violations of the Fifth and Fourteenth Amendments to and the Commerce Clause and Dormant Commerce Clause of the United States Constitution, as well as to the Separation of Powers and Non-Delegation Clauses of the Michigan Constitution. Plaintiffs also bring takings claims under both the United States and Michigan Constitutions.

19. This Court has jurisdiction under 28 U.S.C. §§ 1331 and 1343, which confer original jurisdiction on federal district courts to hear suits alleging the violation of rights under the

United States Constitution. The Court has supplemental jurisdiction over state law claims under 28 U.S.C. § 1367.

20.　　This Court has personal jurisdiction over Defendant because he is an official of, and resides in, the State of Michigan.

21.　　Venue in this District is proper under 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to the claims occurred in this District.

## BACKGROUND

**Actions by the Executive Branch**

22.　　On March 10, 2020, Governor Whitmer issued Executive Order 2020-04. That order declared a state of emergency related to COVID-19 under section 1 of Article X of the Michigan Constitution of 1963, the Emergency Management Act, 1976 PA 390, as amended, MCL 30.401 *et seq.*, (the "EMA"), and the Emergency Powers of the Governor Act of 1945, MCL 10.31 *et seq.* (the "EPGA"). On April 1, 2020, Governor Whitmer issued Executive Order 2020-33 which expanded on Executive Order 2020-04, and declared both a state of emergency and a state of disaster in Michigan. On April 30, 2020, Governor Whitmer issued Executive Order 2020-67 to continue the emergency declaration under the EPGA, as well as Executive Order 2020-68 to issue *new* emergency and disaster declarations under the EMA. Governor Whitmer also issued Executive Order 2020-21 on March 23, 2020 ordering all people in Michigan to stay home and stay safe.

23.　　The Michigan Legislature denied an April 2020 request from Governor Whitmer to extend the state of emergency then in place and filed suit challenging Governor Whitmer's authority to issue additional Executive Orders shutting down businesses state-wide when the Governor deemed those businesses non-essential. In spite of this clear messaging from the

7

Legislature, Governor Whitmer went on to issue nearly 200 additional COVID-19-related Executive Orders which at times entirely shut down some non-essential businesses while merely regulating other non-essential businesses.

24.     On October 2, 2020, the Michigan Supreme Court entered an order invalidating Governor Whitmer's Executive Orders issued after April 30, 2020.  *In re Certified Questions,* No. 161492, 2020 WL 5877599, (Mich. Oct. 2, 2020).  The Court *unanimously* held that the Governor did not have authority to issue or renew any Executive Orders relating to the COVID-19 pandemic under the EMA after April 30, 2020.  Neither did the Governor have authority to issue the orders under the EPGA because the Act unlawfully and unconstitutionally delegates legislative power to the Executive Branch.

25.     Governor Whitmer moved to delay the implementation of the Michigan Supreme Court's ruling on October 5, 2020, but the court denied her motion.

26.     Ostensibly pursuant to power delegated by the Legislature under MCL 333.2253, MDHHS has since October 5, 2020 issued three Emergency Orders.  First, an order issued on October 5, 2020 restricted gatherings and required face covering requirements.  Four days later, an order issued on October 9, 2020 repealed and replaced the October 5, 2020 Order and expanded regulations on Michigan businesses and recreational activities.  On October 29, 2020, MDHHS issued another order that repealed and replaced the October 9 Order and further expanded regulations and restrictions on Michigan businesses and recreational activities.

27.     On November 15, 2020, MDHHS issued an order that completely prohibits indoor on-premises consumption of food and beverages at Michigan restaurants and bars.  The November 15 Order does not bar other businesses from indoor operations with appropriate safety restrictions nor does it offer any reasoned basis for treating restaurants differently than other businesses, such

as salons, tattoo parlors, and retail shops.  A violation of the November 15 Order is a misdemeanor, punishable by criminal penalties and civil fines.

**The Impact on Plaintiffs**

28.      In spite of the ongoing pandemic, for several months Plaintiffs and other similarly situated restaurants, cafes, coffee houses, bars, taverns, brew pubs, microbreweries, wineries, tasting rooms and clubs have been safely providing food and beverages for indoor, on-premises consumption and following the strict guidelines issued by the CDC, Governor Whitmer's Executive Orders, and MDHSS's Orders.

29.      Under threat of fines and criminal penalties, the November 15 Order materially restricts Plaintiffs' businesses.  Plaintiffs' have lost the ability to use their real and personal property in any meaningful economically beneficial manner.  Plaintiffs' employees have lost their ability to work at their jobs, and to receive their regular pay and health benefits.

30.      The November 15 Order will bring further economic devastation for Plaintiffs' businesses.  More than 17,500 eating and drinking places operated in Michigan in 2019.  Between March 1 and April 16, 2020, 53% of operators had already temporarily closed their establishments.  During the same time period, 88% of those operators laid off or furloughed employees.  At the start of 2020 there were over 450,000 restaurant and food service jobs in Michigan representing 10% of the state's employment, but almost 250,000 of those employees had to be laid off or furloughed between March and May 2020.  Many of these Michigan businesses have not survived.  Approximately 2,000 restaurants have already closed their doors permanently in Michigan in 2020 and if the prohibition on indoor dining is prolonged, 6,000 more restaurants are likely to

permanently close in the coming months.  Nationwide, more than 100,000 restaurants – or 1 in 6 restaurants – have closed permanently or long-term because of the pandemic.[1]

31.    Plaintiffs' businesses have already lost hundreds of millions of dollars in business opportunities as a result of the Governor's invalid Executive Orders and now are singled out from other non-essential businesses and suffering additional devastating losses under the November 15 Order.  They are also experiencing renewed harm to their reputations and their relationships with employees, vendors, and customers.

32.    The November 15 Order poses constitutional problems because some private businesses – such as gyms, retail establishments, tattoo parlors, salons – may still conduct indoor business operations under the November 15 Order, while other similarly situated businesses like Plaintiffs' cannot.

33.    The November 15 Order is not generally applicable because it does not apply equally to all businesses that can accomplish their purposes by implementing health and safety procedures that will reasonably protect their employees and guests.

34.    The November 15 Order is neither neutral nor generally applicable because Defendants have exempted certain private businesses that can accomplish their purposes through implementation of health and safety procedures that will keep their employees and guests reasonably safe, but not Plaintiffs who can clearly operate safely during a pandemic.

35.    This indiscriminate ban on Plaintiffs' offering food and beverages for indoor consumption, given their demonstrated ability and willingness to implement health and safety procedures that will keep their employees and guests reasonably safe, is not rationally related to stopping the spread of COVID-19.

---

[1] https://www.travelandleisure.com/food-drink/coronavirus-pandemic-restaurant-shutdowns, last accessed November 13, 2020.

36978382.1

**The Impact on the Public**

36.     The impact of the November 15 Order is devastating to the entire food industry supply chain (both in- and out-of-state) and to all Michiganders who rely on Plaintiffs' businesses and the restaurant industry for their livelihoods, entertainment, and sustenance.

## CAUSES OF ACTION

### COUNT I – Violation of the Commerce Clause and Dormant Commerce Clause, U.S. Const. Art. I, Sec. 8, cl. 3, and 42 U.S.C. § 1983

37.     Plaintiffs incorporate herein by reference the allegations in all preceding paragraphs of this Complaint.

38.     The Commerce Clause of the United States Constitution reserves the power to regulate interstate and foreign commerce to Congress.

39.     Because these powers are reserved to Congress, individual states may not unduly burden interstate commerce, including excessively burdening commerce in Michigan and favoring commerce in other states.

40.     The November 15 Order imposes a burden on interstate commerce and on Plaintiffs that is clearly excessive in relation to the putative benefits.  Plaintiffs' businesses impact the flow of interstate commerce, since many of their customers will head to neighboring states where restaurants remain open.  Furthermore, the November 15 Order impermissibly burdens the entire food industry supply chain – both suppliers within Michigan and suppliers to Michigan.

41.     Since Plaintiffs stand ready to provide indoor food and beverage consumption under established health and safety guidelines while respecting social distancing, and have proven their ability to do so, there is nominal or no public benefit to preventing Plaintiffs from providing these services.  Conversely, the November 15 Order singles out and incapacitates these businesses, causing job loss, loss of business revenue, and inevitably bankruptcy and permanent closure of

11

valuable Michigan businesses. The November 15 Order also encourages interstate travel to neighboring states where restaurants are open. Encouraging travel during a time of pandemic is at cross purposes to the MDHHS's stated reasons for issuing the November 15 Order.

42. The November 15 Order impermissibly burdens in-state commerce to the benefit of commerce in neighboring states by forcing Plaintiffs' customers to go out of state for indoor, on-premises dining. The November 15 Order also burdens interstate commerce by burdening the entire food service industry supply chain within and to Michigan.

43. Accordingly, the November 15 Order is an unconstitutional regulation of and interference with interstate commerce and/or an undue burden on in-state commerce in violation of the Dormant Commerce Clause of the United States Constitution.

**COUNT II – Violation of the 14th Amendment's Due Process Clause
and 42 U.S.C. § 1983**

44. Plaintiffs incorporate herein by reference the allegations in all preceding paragraphs of this Complaint.

45. The Fourteenth Amendment provides that "[n]o State shall . . . deprive any person of life, liberty, or property, without due process of law."

46. The November 15 Order has not attempted to provide _any_ procedural due process safeguards. Likewise, no mechanism of any kind exists for post-deprivation review.

47. Plaintiffs have a right to operate their businesses with restrictions, and to do so without being treated unequally by the government.

48. Plaintiffs have no adequate remedy at law for this continuing violation of their constitutional rights.

### COUNT III – Violation of the 14th Amendment's Equal Protection Clause
### and 42 U.S.C. § 1983

49.     Plaintiffs incorporate herein by reference the allegations in all preceding paragraphs of this Complaint.

50.     The Equal Protection Clause of the Fourteenth Amendment to the United States Constitution provides that no State can "deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. Amend. XIV, § 1, cl. 4.

51.     The November 15 Order arbitrarily and improperly singles out and deprives Plaintiffs of their rights and freedoms to engage in their business operations, while allowing other similarly situated businesses to operate and denies Plaintiffs equal protection of the laws under the United States.

52.     Plaintiffs have a right to operate their businesses with restrictions, and to do so without being treated unequally by the government.

53.     The November 15 Order is neither neutral nor generally applicable and singles out restaurants while permitting indoor business operations at many other non-essential businesses such as salons, gyms, tattoo parlors, and retail establishments.  The November 15 Order permits many businesses to continue operating with no rational basis for those exceptions.  This order, as applied to Plaintiffs, is not rationally related to the State's goal of preventing the spread of COVID-19.

54.     Plaintiffs have no adequate remedy at law for this continuing violation of their constitutional rights.

36978382.1

## COUNT IV – Violation of the Takings Clauses of the U.S. & Michigan Constitutions and 42 U.S.C. § 1983 (Individual Plaintiffs)

55. Plaintiffs incorporate herein by reference the allegations in all preceding paragraphs of this Complaint.

56. Defendants have seized without appropriate compensation Plaintiffs' real and personal property by forcing material limitations on their businesses.

57. These uncompensated seizures violate the Takings Clause of the Fifth Amendment, made applicable to States through the Fourteenth Amendment, and Article X, Section 2 of Michigan's 1963 Constitution.

58. The November 15 Order represents a taking of Plaintiffs' property for a public purpose, as the taking is one the Defendants have justified as protecting Michigan's public health, safety, and welfare.

59. Defendants have placed the cost of any public benefit of the November 15 Order on the shoulders of private businesses like Plaintiffs' and have failed to offer appropriate compensation for these takings.

60. The November 15 Order materially and substantially jeopardizes the sustainability of Plaintiffs' businesses and Plaintiffs' rights to property ownership.

61. The U.S. and Michigan Takings Clauses do not prohibit the government's authority to interfere with private property, but they do require the government to pay adequate compensation for a taking.

62. The Takings Clauses apply to permanent as well as temporary interference with private use of personal and real property.

63. As a result of the November 15 Order, Plaintiffs, and those similarly situated, have at least temporarily lost the economically beneficial use of their real and personal property.

14

64. The November 15 Order effects an unconstitutional taking without just compensation.

## COUNT V – Violation of the Michigan Constitution – Separation of Powers and Non-Delegation Clauses

65. Plaintiffs incorporate herein by reference the allegations in all preceding paragraphs of this Complaint.

66. The November 15 Order is unconstitutional and unenforceable against Plaintiffs because it rests on impermissible delegations of legislative authority to the Executive Branch, a violation of the Michigan Constitution and the spirit of the Michigan Supreme Court's recent order in *In re Certified Questions From U.S. Dist. Court, W. Dist. Of Mich., S. Div.,* No. 161492, 2020 WL 5877599 (Mich. Oct. 2, 2020).

67. The Separation of Powers Clause in the Michigan Constitution provides, "The powers of government are divided into three branches: legislative, executive, and judicial. No person exercising powers of one branch shall exercise powers properly belonging to another branch except as expressly provided in this constitution." Mich. Const. (1963) art. III, Section 2.

68. The legislative power in the State of Michigan is explicitly vested in the Michigan Legislature. *Id.* art. IV, Section 1.

69. Executive lawmaking is unlawful under the Michigan Constitution. Unlawful executive lawmaking includes a delegation of authority to the executive branch that is not sufficiently specific, a failure to establish boundaries, or executive action beyond the Legislature's established boundaries. *See, e.g., In re Certified Questions From U.S. Dist. Court, W. Dist. Of Mich., S. Div.,* No. 161492, 2020 WL 5877599 (Mich. Oct. 2, 2020).

70. When issuing its COVID-19 emergency orders, including the November 15 Order, MDHHS relies on an impermissible delegation of legislative authority in Section 333.2253, which

15

provides only the vague parameters that "the director by emergency order may prohibit the gathering of people for any purpose and may establish procedures to be followed during the epidemic to insure continuation of essential public health services and enforcement of public health laws." Mich. Comp. Laws § 333.2253.

71. Because Section 333.2253 does not by its terms authorize MDHHS to promulgate a regulatory scheme or in any way to restrict gatherings, but only permits MDHHS to *prohibit* gatherings entirely, it does not provide authorization or sufficient parameters for the executive branch's lawful exercise of authority. Because the November 15 Order is not a blanket prohibition but instead purports to be a regulatory scheme, it exceeds any putative authority Section 333.2253 confers and Director Gordon by issuing the November 15 Order has impermissibly and unconstitutionally infringed on legislative authority. The executive branch may not engage in or justify its improper, unconstitutional lawmaking based on such slim guidance and may not establish a regulatory scheme in a total absence of authority.

72. The capricious, sporadic, and selective regulations in the November 15 Order – regulations that irrationally single out restaurants and bars while permitting other non-essential businesses to offer indoor services – are not based in science and lack any imaginable rational basis for the total closure of indoor food and beverage consumption in restaurants. The November 15 Order cites no data to support singling out restaurants and bars, and MDHHS's own data shows that restaurants and bars are not a significant course of COVID-19 outbreaks. It is axiomatic that closing restaurants over the Thanksgiving holiday will contribute to increasing the number of unregulated in-residence gatherings which do not allow for proper social distancing and have repeatedly proven to be super-spreader events. The closure of restaurants and bars for indoor consumption of food and beverages while many other businesses remain open for indoor services

16

is arbitrary, capricious, and not in any conceivable way rationally related to any public health goals. As explained above, the November 15 Order may well contribute to the increased spread of COVID-19. The November 15 Order thus exceeds the authority granted to MDHHS by promulgating an impermissible regulatory scheme that selectively and onerously punishes restaurants while allowing other businesses to operate.

73. Even if Section 333.2253 did provide sufficient boundaries for executive lawmaking – which it does not – the Executive Branch has here acted well beyond its authority and in direct contravention to the Michigan Supreme Court's order in *In re Certified Questions From U.S. Dist. Court, W. Dist. Of Mich., S. Div.,* No. 161492, 2020 WL 5877599 (Mich. Oct. 2, 2020). As Michigan Supreme Court's order makes plain, without consulting the Legislature to gain specific guidance for promulgating rules and regulations, *the Executive Branch cannot legislate at all*, let alone assess and enforce criminal penalties for alleged violations of its unconstitutional regulatory scheme. The November 15 Order is in direct violation of the Michigan Constitution and recent Michigan Supreme Court guidance.

## **REQUEST FOR RELIEF**

WHEREFORE, Plaintiffs respectfully requests that this Court:

a. Grant immediately an emergency, preliminary injunction that authorizes Plaintiffs to provide indoor, on-premises food and beverage consumption in accord with appropriate health and safety protocols;

b. After the claims are fully adjudicated, declare the November 15 Order unconstitutional as applied, and permanently enjoin their enforcement against Plaintiffs and others similarly situated;

c.  After the claims are fully adjudicated, declare the November 15 Order an unconstitutional taking under the U.S. and Michigan Constitutions and compensate Plaintiffs accordingly;

d.  Pursuant to 42 U.S.C. § 1988, enter an award of reasonable attorney fees and costs in favor of Plaintiffs; and

e.  Grant such other and further relief as the Court deems just and proper.

Respectfully submitted,

Dated: November 18, 2020

*/s/ Kenneth T. Brooks*
Kenneth T. Brooks (P33834)
Peter Ruddell (P63253)
Kelli Mulder (P84441) (*admission pending*)
*Honigman LLP*
*Attorneys for Plaintiffs*
222 N. Washington Sq., Suite 400
Lansing, MI  48933
(517) 377-0735; kbrooks@honigman.com

36978382.1

## **VERIFICATION**

I, Justin Winslow, declare as follows:

1.  I am an adult competent to testify to the matters stated herein.

2.  I am the President and CEO of the Michigan Restaurant and Lodging Association and in that capacity, I am familiar with the business of Suburban Inn and Heirloom, both Plaintiffs in this action.

3.  I am also very knowledgeable about the food service industry in Michigan and the devastating impact of the government's COVID-19 emergency orders on the industry.

4.  I have read the foregoing First Amended Verified Complaint for Declaratory and Injunctive Relief, and, based upon my personal knowledge of the facts stated therein, the facts stated in the First Amended Verified Complaint are true to the best of my knowledge and belief.

5.  If called upon to testify, I would competently testify as to the matters stated herein.

6.  I have verified this Complaint via remote notary.

7.  Accordingly, pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Dated: November 18, 2020.

In accordance with Michigan law, the foregoing instrument was acknowledged before me while I was located in Clinton County, Michigan by Justin Winslow through the use of two-way real-time audiovisual technology which allowed direct simultaneous interaction by sight and sound between me and Justin Winslow on November 18, 2020, in which Justin Winslow affirmatively represented that he was either physically situated in the state of Michigan or was outside the geographic boundaries of the state of Michigan and that this instrument is either (1) intended for filing with or relates to a matter before a court, governmental entity, public official, or other entity subject to the jurisdiction of the State of Michigan; or (2) involves property located in the territorial jurisdiction of the state of Michigan or a transaction substantially connected to the state of Michigan.

*Alison Keilen* 11/18/2020

Notary's Name: Alison Keilen
Notary Public, State of Michigan,
County of Clinton
My Commission expires: Jan. 22, 2025
Notarized using electronic/remote technology



ALISON N. KEILEN
Notary Public, State of Michigan
County of Clinton
My Commission Expires Jan. 22, 2025
Acting in the County of Clinton

# EXHIBIT 1



STATE OF MICHIGAN

GRETCHEN WHITMER
GOVERNOR

DEPARTMENT OF HEALTH AND HUMAN SERVICES
LANSING

ROBERT GORDON
DIRECTOR

**November 15, 2020**

## Emergency Order under MCL 333.2253 – Gatherings and Face Mask Order

Michigan law imposes on the Michigan Department of Health and Human Services (MDHHS) a duty to continually and diligently endeavor to "prevent disease, prolong life, and promote public health," and gives the Department "general supervision of the interests of health and life of people of this state." MCL 333.2221. MDHHS may "[e]xercise authority and promulgate rules to safeguard properly the public health; to prevent the spread of diseases and the existence of sources of contamination; and to implement and carry out the powers and duties vested by law in the department." MCL 333.2226(d).

The novel coronavirus (COVID-19) is a respiratory disease that can result in serious illness or death. It is caused by a new strain of coronavirus not previously identified in humans and easily spread from person to person. There is currently no approved vaccine for this disease. COVID-19 spreads through close human contact, even from individuals who may be asymptomatic.

In recognition of the severe, widespread harm caused by epidemics, the Legislature has granted MDHHS specific authority, dating back a century, to address threats to the public health like those posed by COVID-19. MCL 333.2253(1) provides that "[i]f the director determines that control of an epidemic is necessary to protect the public health, the director by emergency order may prohibit the gathering of people for any purpose and may establish procedures to be followed during the epidemic to insure continuation of essential public health services and enforcement of health laws. Emergency procedures shall not be limited to this code." See also *In re Certified Questions*, Docket No. 161492 (Viviano, J., concurring in part and dissenting in part, at 20) ("[T]he 1919 law passed in the wake of the influenza epidemic and Governor Sleeper's actions is still the law, albeit in slightly modified form."); *id.* (McCormack, C.J., dissenting, at 12). Enforcing Michigan's health laws, including preventing disease, prolonging life, and promoting public health, requires limitations on gatherings and the establishment of procedures to control the spread of COVID-19. This includes limiting the number, location, size, and type of gatherings, and requiring the use of mitigation measures at gatherings as a condition of hosting such gatherings.

On March 10, 2020, MDHHS identified the first two presumptive-positive cases of COVID-19 in Michigan. As of November 13, 2020, Michigan had seen 244,741 confirmed cases and 7,929 confirmed deaths attributable to COVID-19. Michigan was one of the states most heavily impacted by COVID-19 early in the pandemic, with new cases peaking at nearly 2,000 per day in late March. Strict preventative measures and the cooperation of Michiganders drove daily case numbers dramatically down to less than 200 confirmed cases in mid-June, greatly reducing the loss of life. Since October, Michigan has seen an exponential growth in cases. Daily new cases are now over 6,000 which is three times higher than what was seen in the spring.

The State of Michigan presently has a seven-day average of 512 cases per million people, which is five times higher than the case rate on October 1. Test positivity has increased from 3.2% in early October to 12% on November 13. And while testing has increased 78% since October 1, test positivity has increased 225% during that same time frame, indicating COVID-19 spread is happening much more quickly than tests being administered. All regions in Michigan are now at the highest risk level, with seven-day averages in excess of 150 cases per million residents. Rising cases creates significant pressure on our

**EXHIBIT 1**

emergency and hospital systems. Complaints of coronavirus-like illness in emergency departments increased for the ninth week in a row for the state. Hospitalizations for COVID-19 have doubled in less than two weeks, and there are now over 4.5 times the hospitalizations recorded on October 1. An average of 363 daily hospital admissions were seen in Michigan in the last week, and with individuals under 60 years old accounting for nearly half of all new hospital admissions. With over 3,000 Michiganders hospitalized for COVID-19, 15% of all available inpatient beds are now occupied by patients who have COVID-19, the highest number since mid-April. The state death rate is 5 deaths per million people and continues to increase. The current death rate is four times higher than it was in early October. There are more than 300 weekly deaths in Michigan and nearly every region has more than 20 weekly deaths. Due to delays between exposure, onset of symptoms, and hospitalization, the sharp rise in new infections suggests that the state is entering the most challenging phase of the pandemic thus far.

To protect vulnerable individuals, ensure the health care system can provide care for all health issues, and prevent spread in schools during the influenza season, we must reduce the spread of COVID-19. This necessitates use of more forceful mitigation techniques to reduce the spread of the virus. As such, it is necessary to issue orders under the Public Health Code addressing these topics.

Considering the above, and upon the advice of scientific and medical experts, I have concluded pursuant to MCL 333.2253 that the COVID-19 pandemic continues to constitute an epidemic in Michigan. I have also, subject to the grant of authority in 2020 PA 238 (signed into law on October 22, 2020), herein defined the symptoms of COVID-19 based on the latest epidemiological evidence. I further conclude that control of the epidemic is necessary to protect the public health and that it is necessary to restrict gatherings and establish procedures to be followed during the epidemic to ensure the continuation of essential public health services and enforcement of health laws. As provided in MCL 333.2253, these emergency procedures are not limited to the Public Health Code.

I therefore order that:

1. **Definitions.**

    (a) "Child-care organization" means that term as defined by section 1(b) of the Child Care Organizations Act, 1973 PA 116, as amended, MCL 722.111b)) and day, residential, travel, and troop camps for children (as defined by Rule 400.11101(1)(q) of the Michigan Administrative Code).

    (b) "Face mask" means a tightly woven cloth or other multi-layer absorbent material that closely covers an individual's mouth and nose.

    (c) "Food service establishment" means that term as defined in section 1107(t) of the Food Law, 2000 PA 92, as amended, MCL 289.1107(t).

    (d) "Employee" means that term as defined in section 2 of the Improved Workforce Opportunity Wage Act, 2018 PA 337, as amended, MCL 408.932, and also includes independent contractors.

    (e) "Gathering" means any occurrence, either indoor or outdoor, where two or more persons from more than one household are present in a shared space.

    (f) "Household" means a group of persons living together in a shared dwelling with common kitchen or bathroom facilities. In dwellings with shared kitchen or bathroom facilities occupied by 20 or more unrelated persons, households are defined by individuals who share a bedroom.

    (g) "Organized sports" means competitive athletic activity requiring skill or physical prowess and organized by a sports organizer.

(h) "Sports Organizer" means an institution, association, or other organization that sets and enforces rules to ensure the physical health and safety of all participants for an organized sport.

(i) "Exercise facility" means a location in which individuals participate in individual or group physical activity, including gymnasiums, fitness centers, and exercise studios.

(j) "Symptoms of COVID-19" means at least 1 of fever, uncontrolled cough, or atypical new onset of shortness of breath, or at least 2 of the following not explained by a known physical condition: loss of taste or smell, muscle aches, sore throat, severe headache, diarrhea, vomiting, or abdominal pain. Per section 1(h) of 2020 PA 238, this definition represents the latest medical guidance, and serves as the controlling definition.

2. **General capacity limitations at gatherings.**

(a) Indoor gatherings:

   (1) Are prohibited at residential venues, except where no more than 10 persons from no more than 2 households are gathered. Such gatherings should be held consistent with guidance issued by the Department of Health and Human Services for such gatherings;

   (2) Are prohibited at non-residential venues.

(b) Outdoor gatherings are permitted only as follows:

   (1) At residential venues, 25 or fewer persons are gathered, comprised of no more than 3 households;

   (2) At non-residential venues:

      (A) 25 or fewer persons are gathered at a venue without fixed seating, and attendance is limited to 20 persons per 1,000 square feet, including within any distinct area within the event space;

      (B) 25 or fewer persons are gathered at a venue with fixed seating, and attendance is limited to 20% of seating capacity of the venue.

(c) The limitations to gatherings in sections 2(a) and 2(b) do not apply to:

   (1) Incidental, temporary gatherings of persons in a shared space, such as frequently occur in an airport, bus station, exercise facility, food service establishment, shopping mall, or public pool, except as prohibited in section 3;

   (2) Gatherings between an employee and a customer for the purpose of receiving services;

   (3) Workplace gatherings that occur consistent with the Emergency Rules issued by MIOSHA on October 14, 2020;

   (4) Voting or official election-related activities;

   (5) Training of law enforcement, correctional, medical, or first responder personnel, insofar as those activities cannot be conducted remotely;

(6) Education and support services at public, nonpublic, and boarding schools serving students in prekindergarten through grade 8;

(7) Children in a child-care organization or camp setting;

(8) Persons traveling on a school bus or other public transit;

(9) Gatherings for the purpose of medical treatment, including mental health and substance use disorder support services;

(10) Gatherings of up to 25 persons for the purpose of a funeral;

(11) Residential care facilities, which are subject to the October 21 epidemic order entitled "Requirements for Residential Facilities," or any replacement of that order.

(d) As a condition of hosting a gathering under this order, organizers and venues must design the gathering to encourage and maintain physical distancing, and must ensure that persons not part of the same household maintain 6 feet of distance from one another to the extent possible.

3. **Gathering restrictions for particular types of facilities.**

(a) Gatherings, are prohibited in the following settings:

(1) Entertainment venues, including: auditoriums; arenas; banquet halls; cinemas; conference centers; concert halls; performance venues; sporting venues; stadiums; and theaters;

(2) Recreational facilities and places of public amusement, including: amusement parks; arcades; bingo halls; bowling alleys; casinos; night clubs; skating rinks; strip clubs; water parks; and trampoline parks;

(b) Gatherings are permitted at food service establishments under the following conditions:

(1) Persons are not gathered indoors except in custodial settings, medical facilities, school and university cafeterias, shelters, and soup kitchens. If attendees are seated at tables, persons must be 6 feet apart, or members of a household may share a table and tables must be spaced a minimum of 6 feet apart;

(2) Persons participating in outdoor dining are seated no more than 6 to a table and tables are spaced a minimum of 6 feet apart.

(c) Nothing in this section shall be construed to prohibit the use of these facilities for public health or other emergency purposes.

4. **Gathering restrictions for facilities.** In addition to the gathering limitations set forth elsewhere in this order, the following limitations apply to gatherings in the following facilities:

(a) A gathering at a retail store, library, or museum must not exceed 30% of total occupancy limits established by the State Fire Marshal or a local fire marshal. Nevertheless, a retail store, library, or museum may permit one customer at a time to enter if strict adherence to the 30% total occupancy limit would otherwise result in closure.

    (1) Retail stores must establish lines to regulate entry and checkout, with markings for patrons to enable them to stand at least six feet apart from one another while waiting.

(b) At exercise facilities:

    (1) Gatherings must not exceed 25% of the total occupancy limits established by the State Fire Marshal or a local fire marshal; and

    (2) There must be at least 12 feet of distance between each occupied workout station;

    (3) Gatherings for group fitness activities or classes are prohibited.

(c) Gatherings in waiting rooms at outpatient health-care facilities, veterinary clinics, and other businesses are prohibited unless the facility implements a system to ensure that persons not of the same household maintain 6 feet of distance. To the extent possible, this system must include a policy that patients wait in their cars for their appointments to be called.

(d) A gathering at an indoor or outdoor pool not otherwise prohibited by this order must not exceed 25% of bather capacity limits described in Rule 325.2193 of the Michigan Administrative Code.

(e) In facilities offering non-essential personal care services, including hair, nail, tanning, massage, traditional spa, tattoo, body art, and piercing services, and similar personal care services, gatherings are only permitted to the extent that services do not involve the removal of face masks. All services must be provided by appointment, and gatherings in waiting areas are prohibited.

5. **Schools, colleges, and universities.**

(a) Gatherings at public, nonpublic, and boarding schools for the purpose of conducting in-person instruction, sports, and extracurricular activities serving pupils in grades 9 through 12 are prohibited, except for in-person instruction of pupils who are English Language Learners or participants in special education services;

(b) Gatherings at public, nonpublic, and boarding schools for the purpose of conducting in-person instruction of pupils in prekindergarten through grade 8 are permitted, subject to local health department and school district decisions on remote learning. Gatherings for the purpose of sports and extracurricular activity are prohibited;

(c) Gatherings at public, nonpublic, and boarding schools are permitted for the purpose of providing services to students in need, including food distribution, access to internet connectivity, physical and mental health care services, and child care;

(d) Gatherings at colleges and universities are prohibited for the purpose of holding in-person classes, extracurricular events, or other events are prohibited, except as permitted in sections 2 and 6 of this order.

6. **Organized sports gathering restrictions.**

(a) Gatherings for the purpose of organized sports are prohibited unless all participants, teams, and venues comply with the enhanced testing regimen specified in the Additional Mitigation Measures for Safer Athletic Practice and Play without the use of Face Coverings section of MDHHS guidance on Additional Measures for Safer Athletic Practice and Play.

Sports organizers complying with this section may host gatherings for the purpose of practice and competition notwithstanding the gathering prohibitions in sections 2 and 5(c).

(b) Sports organizers may not permit gatherings of spectators.

7. **Face mask requirement at gatherings.**

(a) All persons participating in gatherings are required to wear a face mask.

(b) As a condition of gathering for the purpose of transportation, transportation providers must require all staff and patrons to use face masks, and must enforce physical distancing among all patrons to the extent feasible.

(c) Except as provided elsewhere in this order, a person responsible for a business, store, office, government office, school, organized event, or other operation, or an agent of such person, must prohibit gatherings of any kind unless the person requires individuals in such gatherings (including employees) to wear a face mask, and denies entry or service to all persons refusing to wear face masks while gathered.

(d) A person responsible for a business, store, office, government office, school, organized event, or other operation, or an agent of such person, may not assume that someone who enters the facility without a face mask falls within one of the exceptions specified in section 8 of this order, including the exception for individuals who cannot medically tolerate a face mask. An individual's verbal representation that they are not wearing a face mask because they fall within a specified exception, however, may be accepted.

(e) A person responsible for a child-care organization or camp, or an agent of such person, must not allow gatherings unless face masks are worn by all staff. Children must wear face masks as indicated below:

(1) All children 2 years and older when on a school bus or other transportation provided by the child-care organization or camp;

(2) All children 4 years and older when in indoor hallways and indoor common areas;

(3) All children 5 years and older when in classrooms, homes, cabins, or similar indoor settings.

8. **Exceptions to face mask requirements.** Although a face mask is strongly encouraged even for individuals not required to wear one (except for children under the age of 2), the requirement to wear a face mask in gatherings as required by this order does not apply to individuals who:

(a) Are younger than 5 years old, outside of child-care organization setting (which are subject to requirements set out in section 7(e));

(b) Cannot medically tolerate a face mask;

(c) Are eating or drinking while seated at a food service establishment or at a private residence;

(d) Are exercising outdoors and able to consistently maintain 6 feet of distance from others;

(e) Are swimming;

(f) Are receiving a medical service for which removal of the face mask is necessary;

(g) Are asked to temporarily remove a face mask for identification purposes;

(h) Are communicating with someone who is deaf, deafblind, or hard of hearing and whose ability to see the mouth is essential to communication;

(i) Are actively engaged in a public safety role, including but not limited to law enforcement, firefighters, or emergency medical personnel, and where wearing a face mask would seriously interfere in the performance of their public safety responsibilities;

(j) Are at a polling place for purposes of voting in an election;

(k) Are engaging in a religious service; or

(l) Are giving a speech for broadcast or to an audience, provided that the audience is at least 6 feet away from the speaker.

9. **Contact tracing requirements for particular gatherings.**

(a) Gatherings are prohibited at the following facilities unless the facility maintains accurate records, including date and time of entry, names of patrons, and contact information, to aid with contact tracing, and denies entry for a gathering to any visitor who does not provide, at a minimum, their name and phone number:

(1) All businesses or operations that provide barbering, cosmetology services, body art services (including tattooing and body piercing), tanning services, massage services, or similar personal care services;

(2) Exercise facilities.

(b) All businesses or operations that provide in-home services, including cleaners, repair persons, painters, and the like must not permit their employees to gather with clients unless the business maintains accurate appointment records, including date and time of service, name of client, and contact information, to aid with contact tracing.

(c) Upon request, businesses, schools, and other facilities must provide names and phone numbers of individuals with possible COVID-19 exposure to MDHHS and local health departments to aid in contact tracing and case investigation efforts.

(d) Data collected under this section:

(1) Must not be sold, or used for sales or marketing purposes without the express consent of each patron;

(2) Must be protected as confidential information to the fullest extent of the law;

(3) Must not be provided to law enforcement or immigration officials except upon receipt of a lawful subpoena from a court or other lawful court order;

(4) Must be retained for 28 days by the collecting organization, after which time the data must be destroyed. If facilities use existing data to fulfill this requirement, they may instead follow their own pre-existing data retention and destruction policies at the conclusion of the 28-day retention period.

10. **Implementation.**

    (a) Nothing in this order modifies, limits, or abridges protections provided by state or federal law for a person with a disability.

    (b) Under MCL 333.2235(1), local health departments are authorized to carry out and enforce the terms of this order.

    (c) Law enforcement officers, as defined in the Michigan Commission on Law Enforcement Standards Act, 1965 Public Act 203, MCL 28.602(f), are deemed to be "department representatives" for purposes of enforcing this order, and are specifically authorized to investigate potential violations of this order. They may coordinate as necessary with the appropriate regulatory entity and enforce this order within their jurisdiction.

    (d) Neither a place of religious worship nor its owner is subject to penalty under this order for allowing religious worship at such place. No individual is subject to penalty under this order for engaging in religious worship at a place of religious worship.

    (e) Consistent with MCL 333.2261, violation of this order is a misdemeanor punishable by imprisonment for not more than 6 months, or a fine of not more than $200.00, or both.

    (f) Nothing in this order affects any prosecution or civil citation based on conduct that occurred before the effective date of this order.

    (g) Nothing in this order should be taken to interfere with or infringe on the powers of the legislative and judicial branches to perform their constitutional duties or exercise their authority, or protections guaranteed by the state or federal constitution under these emergency circumstances.

    (h) Consistent with any rule or emergency rule promulgated and adopted in a schedule of monetary civil penalties under MCL 333.2262(1) and applicable to this order, violations of this order are also punishable by a civil fine of up to $1,000 for each violation or day that a violation continues.

    (i) If any provision of this order is found invalid by a court of competent jurisdiction, whether in whole or in part, such decision will not affect the validity of the remaining part of this order.

    (j) It is not a violation of this order for a person to enter a facility otherwise closed for gatherings if they are entering solely for the purpose of using restroom facilities.

This order takes effect on November 18, 2020 at 12:01 AM, at which time the October 29, 2020, order entitled Gatherings and Face Mask Order is rescinded. This order remains in effect through December 8, 2020 at 11:59 PM. Persons with suggestions and concerns are invited to submit their comments via email to COVID19@michigan.gov.

Date:  November 15, 2020

*Robert Gordon*

_____

Robert Gordon, Director

Michigan Department of Health and Human Services